## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| LAWRENCE ROWE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JAMES A. DORIS and CAMBER ENERGY, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. BREACH OF FIDUCIARY DUTY**<br>**2. AIDING AND ABETTING**<br><br>**JURY DEMANDED** |

Plaintiff Lawrence Rowe, by and through his undersigned attorneys, on behalf of himself and all other similarly situated former public minority shareholders of Viking Energy Group, Inc. ("Viking" or the "Company"), alleges as follows upon information and belief, including based upon the review of publicly available information:

### SUMMARY OF THE ACTION

1.      Plaintiff brings this class action complaint on behalf of himself and the former minority holders of Viking common stock, against (1) James A. Doris ("Doris") for fraudulently and knowingly breaching his fiduciary duties to the Company's unaffiliated stockholders in his capacity as Chief Executive Officer, President, and a director of Viking; (2) Doris for fraudulently and knowingly breaching his fiduciary duties to the Company's unaffiliated stockholders in his capacity as the Company's controller; and (3) Camber Energy, Inc. ("Camber") for aiding and abetting the foregoing breaches of fiduciary duty by Doris. Plaintiff's claims arise in connection with the merger between Viking and Camber (the "Merger"), whereby Camber (a financially troubled shell company) acquired Viking (a growing energy exploration and production company)

pursuant to an Agreement and Plan of Merger dated February 15, 2021 and amended April 18, 2023 (the "Merger Agreement").

2.     As set forth below, Doris – who was on both sides of the Merger because he was the CEO, President, and a director of **both** Viking and Camber – fraudulently breached his fiduciary duties to Viking's unaffiliated common stockholders by executing a scheme to grant himself a substantial portion of the Company's equity at the expense of all other stockholders. Camber, in turn, aided and abetted Doris's breaches.

3.     Doris's financial and control interests in Viking directly conflicted with the financial and control interests of Viking's unaffiliated common stockholders because, *inter alia*, Doris was the exclusive owner of a unique class of ultra-powerful convertible preferred stock in the Company (Viking's Series C Convertible Preferred Stock) (the "Viking Series C shares").[1] Each such share was entitled to 37,500 votes at a shareholder meeting – as compared to the single vote per share exercised by the Company's common stock – ultimately granting Doris near-total (approximately 90%) control over the voting power of the Company's shares.

4.     Notably, and further misaligning Doris's financial interests with the financial interests of unaffiliated common stockholders, Doris exercised his vast control powers over Viking even though (i) he personally owned less than a fifth of one percent of the Company's common stock (less than 0.2%); and (ii) each of his preferred shares could only be converted into one share of Viking common stock. *I.e.*, he was a controller with minimal equity skin in the game.

5.     As a result, Doris had no strong financial reasons to protect the value of the Company's common stock. Indeed, since he was the exclusive holder of a unique class of Viking's

---

[1] Doris owned 28,092 Viking Series C shares.

Series C shares, he was overwhelmingly motivated to favor Viking's Series C shares at the expense of its common stock in any restructuring of ownership rights in the Company.

6.      That is exactly what Doris did in the Merger. In particular, Doris secured special treatment for his Viking Series C shares by arranging the transaction to convert those shares into newly-issued Camber Series A Convertible Preferred Stock (the "Camber Series A shares"), which possessed orders of magnitude greater economic value. Unlike Doris's Viking Series C shares – which could only be exchanged for **one** newly-created share of Viking common stock – each Camber Series A share could be converted into **890** newly-created shares of the combined company's common stock. Moreover, this conversion could be effected entirely at Doris's option,[2] granting Doris the right to obtain significant ownership of the combined company's common stock (up to 9.99% total beneficial ownership or approximately 25 million newly-created shares). Importantly, since conversion was not conditioned on (e.g.) investment in the company by Doris, each exercise by Doris of his conversion rights would leave stockholders with a smaller slice of exactly the same pie, including the holders of Viking common stock immediately prior to the Merger.

7.      In sum, Doris willfully and disloyally acted to favor his economic interests by providing himself with an exponentially greater claim to the economic value of Viking's business through a maneuver that offered no value to the Company or its unaffiliated stockholders.

8.      Adding insult to injury, Doris signed this unfair deal with himself, unchecked by even the self-interest of insiders on the other side of the negotiating table.

---

[2]      The Certificate of Designation for Camber's Series A shares provides as follows: Section 6. Conversion. (a) Right to Convert. Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into eight hundred and ninety (890) shares of fully paid and non-assessable Common Stock (the "Conversion Rate").

9.    On June 13, 2023, Doris and the other members of the Viking Board authorized the filing of a materially incomplete, misleading, and fraudulent joint proxy statement/prospectus (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC").[3]

10.    On July 20, 2023, at the special meeting of Viking shareholders, approximately 1,137,750,817 votes were cast to approve the Merger (the "Shareholder Vote"). However, of those votes, over a billion were cast by Doris through his preferred shares.[4]

11.    On August 1, 2023, the Merger was completed, with Viking becoming a wholly owned subsidiary of Camber.

12.    Between April 18, 2023 and August 1, 2023, Camber's stock price declined from $1.62 to $0.89. Since the Merger closed, the price of Camber stock has gone from $0.81 on August 3, 2023 to $0.16 as of February 9, 2024. The trading price of Viking common stock as of July 31, 2023, the day before the Merger was completed, was $0.81.

## PARTIES

### I.    Plaintiff

13.    Plaintiff Lawrence Rowe (defined above as "Plaintiff") was, at all relevant times, the owner of Viking common stock. Plaintiff is a citizen of New York.

### II.    Defendants

14.    Defendant James A. Doris (defined above as "Doris") was, at all relevant times since 2014, the President, CEO, and a director of Viking. Doris was, at all relevant times, a citizen of Texas.

---

[3]    The Proxy is available at the following link:
https://www.sec.gov/Archives/edgar/data/1309082/000147793223004519/cei_s4a.htm
[4]    Doris cast 1,053,450,000 votes in favor of the Merger through his Viking Series C shares and an additional 222,223 votes in favor through his Viking common stock. Camber cast a further 69,928,356 votes in favor through its ownership of 61% of Viking's common stock.

15.     Defendant Camber Energy, Inc. (defined above as "Camber") is a public company incorporated under the laws of Nevada with principal executive offices located at 15915 Katy Freeway, Suite 450, Houston, TX 77094. Camber trades on the NYSE under the ticker symbol "CEI".

**III.     Relevant Non-Parties**

16.     Viking Energy Group, Inc. (defined above as "Viking") was a public company incorporated under the laws of Nevada with principal executive offices located at 15915 Katy Freeway, Suite 450, Houston, TX 77094. Viking was traded over the counter under the ticker symbol "VKIN". Upon consummation of the Merger, Viking survived as a wholly-owned subsidiary of Camber.

<u>**JURISDICTION AND VENUE**</u>

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because: (i) there is complete diversity of the parties, and (ii) the amount in controversy exceeds $75,000.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, as this is a class action in which a member of the Class of plaintiffs is a citizen of a State different from any Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. Indeed, there are approximately 49,067,929 shares held by Class members. As alleged, the Exchange Ratio was unfair to the Class and did not provide them with fair value for their Viking common shares, and the Merger damaged the Class, in an amount that exceeds the sum or value of $5,000,000, exclusive of interest and costs.

19.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under 28 U.S.C. § 1391 because both Defendants reside in this District and are residents of Texas, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SUBSTANTIVE ALLEGATIONS

I.     **Relevant Corporate Background**

A.     **Viking**

21.     Prior to the Merger, Viking was a growing energy exploration and production company that acquired and developed oil and natural gas properties in North America and provided energy and power services to the industrial and commercial sectors. The Company operated through two segments, Oil and Gas Production and Power Generation.

22.     Viking's largest subsidiary was Simson-Maxwell, a leading Canadian-based manufacturer and supplier of industrial engines, power generation products, and services. Its diverse product line focused on providing economical, flexible, efficient, and sustainable clean-tech solutions through a wide variety of different options including, wind, solar, energy storage, combined heat and power (CHP), as well as tier 4 final diesel and natural gas industrial engines.

23.     Further, the Company's wholly-owned subsidiaries Petrodome Energy, LLC, Mid-Con Petroleum, LLC and Mid-Con Drilling, LLC owned interests in multiple actively producing oil wells and development projects in Texas, Louisiana, Mississippi, and Kansas.

24.     The Company also held an exclusive license in Canada to a patented carbon-capture system, and had a majority interest in: (i) an entity with intellectual property rights to a medical

waste treatment system; and (ii) entities with the intellectual property rights to electric transmission and distribution open conductor detection systems.

25.     As of the record date to vote on the Merger, Viking's share capitalization consisted of 119,218,508 shares of common stock (of which 222,223 were owned by Doris), 28,092 shares of Viking Series C shares (all owned by Doris), and 475 shares of Viking Series E Preferred Stock. Notably, although each share of common stock and Series E Preferred Stock was entitled to one vote, the Viking Series C shares held by Doris were entitled to 37,500 votes per share. As a result, the Viking Series C shares alone afforded Doris unique and indeed extraordinary control over Viking, amounting to nearly 90% of the aggregate voting power held by all three share classes.

26.     In other words, Doris was Viking's controller, but (unlike unaffiliated stockholders) exercised that control through his ownership of a unique class of super-voting preferred shares, thereby allowing him to favor his own economic interests to the detriment of Viking's unaffiliated common stockholders by ensuring that his Viking Series C shares received disparate and superior treatment. As further discussed below, that is exactly what Doris did.

27.     Each Viking Series C share (**exclusively held by Doris**) was converted into the right to receive one Camber Series A share. **Each Camber Series A share is convertible into 890 shares of Camber common stock** (subject to a beneficial ownership limitation preventing conversion into Camber common stock if the holder would be deemed to beneficially own more than 9.99% of Camber's common stock), **will be treated equally with Camber's common stock with respect to dividends and liquidation, and will have voting rights with respect to certain issues.**

7

### B.    Camber

28.    In 2006, Camber went public via a reverse merger. After years of bad investments, operational failures, and a nearly 100% decline in its stock price, Camber began seeking acquisitions to build its value and assets. In August of 2016, Camber acquired assets from parties associated with Segundo Resources LLC.

29.    Following this acquisition, Camber still had substantial debt (Camber's debt was almost double the value of its oil and gas assets at the time), and it was struggling to grow its assets and comply with the NYSE listing standards.

30.    Indeed, in November 2017, Camber received a deficiency letter from the NYSE advising that it was not in compliance with the required minimum levels of stockholders' equity. Consequently, Camber was required to submit a plan of compliance to the NYSE by August 3, 2018, which was later extended to February 3, 2019. In an attempt to regain compliance with the NYSE listing standards, Camber management accelerated the exploration of potential acquisitions of operating companies or assets that would be accretive to Camber's cash flow and earnings.

31.    In August of 2018, Camber sold a substantial part of its assets to N&B Energy, LLC ("N&B Energy"), with N&B Energy agreeing to assume a portion of Camber's debt. Camber, which was now effectively a shell company, focused on acquiring new assets and operations, which led to its introduction to Viking.

32.    In February of 2019, Camber regained compliance with the NYSE's listing standards – though its compliance would later lapse once again, as further discussed below.

II.    **Events Leading to Execution of the Merger**

    A.    **February 2020 Merger Agreement**

    33.    From January 23 through January 25, 2019, James G. Miller ("Miller"), a Camber director, introduced Camber's then CEO, Louis G. Schott, to Viking's CEO, Doris, through Steve Cochennet, a mutual acquaintance of Doris and Miller.[5] At the time, Viking was interested in up-listing to a national exchange like the NYSE (which Camber traded on), and Camber was seeking a partner like Viking with substantial oil/gas operations and a platform for growth. Miller's proactiveness stemmed from his ties to both companies.[6] However, after Camber and Viking engaged in preliminary discussions regarding a transaction, Viking was informed that Camber was pursuing a transaction with Lineal Star Holdings, LLC ("Lineal") instead, so discussions were postponed.

    34.    In July 2019, Camber completed the acquisition of Lineal, pursuant to which Camber acquired Lineal in consideration for preferred stock, which, upon stockholder approval, would have rights to convert into, and vote, a majority of Camber's outstanding common stock (the "Lineal Acquisition"). Thereafter, Camber planned to transition its operations to those of Lineal. However, a requirement of the Lineal Acquisition was that the combined company needed to meet the NYSE initial listing standards at the time of the stockholders' approval of the conversion terms of the preferred stock. Camber determined that the NYSE initial listing requirements could not be met until December 2019, so Lineal and Camber discussed potential

---

[5]    Cochennet was the President and CEO of Guardian 8 Holdings, while Miller served as a director there. Moreover, Cochennet knew Doris from being part-owner of a Kansas-based company, S&B Operating, LLC, that operated some of Viking's oil and gas assets.
[6]    Not only was Miller a director of Camber, but at the time, he also owned approximately 0.351% of the then outstanding shares of Viking (or 319,933 shares of Viking common stock).

transactions that would allow them to meet the NYSE listing standards. As a result, Viking re-entered the discussions.

35.    On August 29, 2019, representatives of Camber at Network 1 Financial Securities, Inc. ("Network 1") advised Doris that Camber was again looking to acquire an oil and gas company.[7] Doris expressed interest, and Viking and Network 1 then signed an NDA. The following day, Network 1 sent Doris a draft term sheet for a transaction with Camber that contemplated the following terms, among others:

- 70% (Viking) / 30% (Camber) ownership split.

- Doris and Schott would be co-CEOs of the combined entity.

- Camber needed to have $6.4 million in cash on hand at closing.

- Requirement that the parties sign the term sheet by August 31, 2019.

36.    In response, Doris first made clear to Network 1 that Viking's current priority was completing an acquisition of oil and gas assets that Viking had been evaluating over the past few months that had a scheduled closing date of October 31, 2019 (the "Viking Acquisition"), so a transaction with Camber was only attractive if it helped Viking complete the Viking Acquisition. Doris then addressed the term sheet. Most notably, he said that Viking would only be willing to offer Camber a 10% to 12% ownership interest in the combined company (assuming the successful completion of the Viking Acquisition), and 15% at most.

---

[7]    Network 1 is a broker/dealer that, like Camber, has a questionable background. The firm has a history of run-ins with U.S. regulators for breaches ranging from a failure to develop written anti-money laundering programs to a lack of policies to detect suspicious transactions and insider trading.

37.    After discussing with Network 1, Doris asked to speak with Camber representatives directly. Consequently, on September 9, 2019, Viking and Camber entered into an NDA and began due diligence discussions with the continued involvement of Network 1.

38.    On September 16 and 17, 2019, a Network 1 representative, on behalf of Viking, requested information from Schott regarding Camber Series C Preferred Stockholders, including copies of Camber's Non-Objecting Beneficial Owners and a stockholders list, a capitalization table, and answers regarding potential cash available for acquisitions.

39.    On October 24, 2019, Camber and Viking executed a term sheet ("October 2019 Term Sheet"), whereby **Viking would acquire Camber** on the following terms:

- 85% (Viking) / 15% (Camber) ownership split of the combined entity.

- Camber must have $4.5 million in cash on hand at closing.

- Parties must sign a definitive agreement by **<u>November 25, 2019</u>**

- Camber Series C Preferred Stock would terminate at closing.

40.    However, the parties were unable to sign a definitive agreement by the November 25, 2019, deadline so the October 2019 Term Sheet expired.

41.    Nevertheless, Viking, Camber, and Network 1 continued discussions regarding a transaction, with Viking again inquiring whether Camber believed it could negotiate a deal with Camber's then Series C Preferred Stockholder[8] to terminate those preferred shares on or prior to the closing of any transaction between the parties.

42.    Meanwhile, Viking engaged Advisory Group Services, Ltd., d/b/a RHK Capital ("RHK Capital"), a FINRA-member broker dealer, to help it complete the Viking Acquisition.

---

[8]    Antilles Family Officer, LLC held 100% of the Camber Series C Preferred Stock, so its consent was effectively required for any material transaction that Camber wanted to enter into.

Thereafter, RHK, Viking, and Camber discussed the possibility of either reviving the October 2019 Term Sheet or structuring a new deal, whereby Viking would assign its interest in the purchase and sale agreement regarding the Viking Acquisition to Camber so that Camber could raise capital to help with Viking's acquisition of Camber, in exchange for a combination of cash, preferred shares, and Camber common shares.

43.    At the end of December 2019, Viking negotiated an extension on the closing date of the Viking Acquisition to February 3, 2020.

44.    Separately, given that Camber and Lineal had no plan for how they would meet the NYSE initial listing standards as a combined company (a condition of the Lineal Acquisition), the Lineal Acquisition was unwound, effective December 31, 2019. As a result, Camber's operations reverted back to oil and gas exploration and production, which led to another search to find a new acquisition target in that space, as Camber was effectively a shell company again.

45.    Thus, on January 3, 2020, Viking and Camber re-engaged in discussions regarding Viking's proposed acquisition of Camber, with Doris proposing the following terms, among others:

- 85% (Viking) / 15% (Camber) ownership split of the combined entity.

- Completion of the Viking Acquisition.

- Camber must have a minimum of $4 million of cash on hand at closing for working capital purposes.

- Camber required to redeem or extinguish its existing Series C Preferred Stock.

- Exclusivity period of 10 business days.

46.    Separately, Doris also proposed that if the parties believed it was more prudent to raise equity capital through Camber (as opposed to Viking) for the Viking Acquisition, then the

12

parties should consider transferring Viking's subsidiary, Elysium Energy, LLC ("Elysium") to Camber, in exchange for Viking receiving Camber's preferred stock.

47.     On January 9, 2020, Fred S. Zeidman ("Zeidman"), a Camber director, had a call with RHK Capital to discuss Doris's background, among other things. That same day, Zeidman met with RHK Capital representatives to discuss the potential transaction between Viking and Camber, and a potential path towards a settlement with the Camber Series C Preferred Stockholder.

48.     Following these discussions, on January 13, 2020, Camber and Viking executed a second term sheet ("January 2020 Term Sheet"), which contained substantially similar terms to the January 3, 2020, terms proposed by Doris, except that Camber Series C Preferred Stock would terminate upon closing.

49.     On January 17, 2020, Viking's legal counsel provided Camber's legal counsel with a draft merger agreement pursuant to the terms of the January 2020 Term Sheet.

50.     On January 21, 2020, Doris emailed Schott an update on Viking's progress with finalizing the senior secured credit facility for the Viking Acquisition, and that RHK Capital was optimistic that Viking would also be able to raise capital for the transaction between Camber and Viking if it were to be finalized that week.

51.     Two days later, Schott advised Doris that it was unlikely that Camber's legal counsel would be able to finish reviewing the draft merger agreement by the end of the week. However, since the January 2020 Term Sheet required the parties to reach a definitive agreement by January 23, 2020 (*i.e.*, 10-day exclusivity period started on January 13, 2020), Viking and Camber signed another term sheet on January 24, 2020, that extended the date for reaching a definitive agreement.

52.      Then, on January 27, 2020, Doris, Schott, and Robert Schleizer ("Schleizer"), Camber's then CFO, met with RHK Capital to discuss the Merger and the Viking Acquisition. They also discussed the need for a resolution with the Camber Series C Preferred Stockholder.

53.      During this time, Viking was also attempting to finalize its debt financing to complete the Viking Acquisition, but needed to raise at least $5 million to do so. Therefore, Doris and Schott discussed the possibility of Camber raising the necessary $5 million for Viking through funds obtained from Camber's Series C Preferred Stockholder (*i.e.*, through the sale of Camber Series C Preferred Stock). However, this course of action would dilute Viking shareholders' leverage in the transaction with Camber, because the Camber Series C Preferred Stockholder would then not want its shares terminated upon closing of the Merger (a recently agreed upon condition between Viking and Camber). Viking management thus decided to negotiate an arrangement with Camber and its Series C Preferred Stockholder.

54.      Consequently, on January 30, 2020, Doris emailed Schott and the representative of the Camber Series C Preferred Stockholder a framework for a possible arrangement, as follows:

- The Camber Series C Preferred Stockholder waives existing triggering events (*i.e.*, defaults) relating to the Camber Series C Preferred Stock.

- The Camber Series C Preferred Stockholder advances at least $5 million in new money to Camber through the purchase of additional shares of Camber Series C Preferred Stock (on similar terms as prior purchases).

- Camber and Viking sign a definitive merger agreement that provides that the existing Camber Series C Preferred Stock share structure can remain in place following closing (*i.e.*, no termination of the Camber Series C Preferred Stock upon completion of a transaction between Camber and Viking).

14

- Camber loans $5 million to Viking, with funds to be released only if the Viking Acquisition is complete.

55.     As a result, on January 31, 2020, Camber's legal counsel circulated a revised draft of the merger agreement to Viking for review.

56.     On February 1, 2020, Doris provided Schott and the representative of the Camber Series C Preferred Stockholder the material documents associated with the $5 million financing, including a term sheet, Securities Purchase Agreement, Promissory Note, and Security and Pledge Agreement (collectively, the "Loan and Security Documents"). The Loan and Security Documents were negotiated previously by Viking and RHK Capital and their respective counsel, and it was anticipated that RHK Capital would facilitate new investors participating in the offering following the entry into the merger agreement with Camber, and thus the new investors would share equally with Camber as it related to the security described in the Security and Pledge Agreement, being a first-ranking security interest against the membership interests owned by Viking in its subsidiary, Elysium. Moreover, Camber was to receive a second ranking security interest against the membership interests owned by Viking in its other subsidiaries.

57.     Following the negotiation of these documents, Viking and Camber executed the February 2020 Merger Agreement on February 4, 2020, which contained the following material terms:

- 80% (Viking) / 20% (Camber) ownership split in the combined entity.

- Camber to provide a $5 million loan to Viking to assist in consummation of the Viking Acquisition. Viking to repay the $5 million, plus interest and other amounts required to be paid by Camber to the Camber Series C Preferred Stockholder upon termination of the Merger (which required the redemption of the Camber Series C

Preferred Stock sold to the Camber Series C Preferred Stockholder as part of the Merger), within 90 days of termination of the Merger, if applicable.

- Completion of the Viking Acquisition.

- No requirement to terminate the Camber Series C Preferred Stock at closing of the Merger.

- Camber and Viking must obtain fairness opinions prior to closing of the Merger.

58.    Camber shareholders' ownership in the combined company increased from 15% to 20% as consideration for Camber advancing the $5 million for the Viking Acquisition. In addition, Camber negotiated a 25% interest in the Viking Acquisition as further consideration.

59.    In conjunction with the execution of the February 2020 Merger Agreement, Viking and Camber also executed the Securities Purchase Agreement. Additionally, Viking assigned Camber 25% of Elysium, with all or a portion of the assigned Elysium interests to be retained by Camber and/or returned to Viking under circumstances relating to the termination of the February 2020 Merger Agreement, and repayment obligations associated with the secured note.

60.    On February 5, 2020, Viking completed the Viking Acquisition. As a result, pursuant to a Placement Agent Agreement between Viking and RHK Capital, RHK Capital received 8% of the proceeds from the $5 million financing raised for the Viking Acquisition (*i.e.*, $400,000 commission).

61.    On March 10, 2020, Camber engaged Mercer Capital Management, Inc. ("Mercer") to render a fairness opinion in connection with the February 2020 Merger Agreement, which Mercer subsequently delivered to Camber on April 23, 2020.

62.    On April 14, 2020, Viking engaged Scalar, LLC ("Scalar") to do the same, and Scalar rendered its fairness opinion to Viking on July 10, 2020.

63.    *I.e.*, it was not until **after** the February 2020 Merger Agreement was executed that Viking and Camber engaged financial advisors to render fairness opinions on the Merger, evincing that the fairness opinions were nothing more than rubber stamps for a deal that had already been agreed to.

64.    Thereafter, Camber and Viking entered into three separate amendments to the February 2020 Merger Agreement, as follows:

- **First Amendment entered into by the parties on May 27, 2020**, which (i) modified the Camber percentage adjustment mechanism to cap the aggregate Camber percentage increase/decrease at 5%; (ii) modified the events resulting in such adjustments; (iii) corrected a prior error with such calculation which discussed Camber being required to have $4 million in cash at closing; and (iv) provided that neither party would raise capital from the other party's existing stockholders without the prior written consent of the other party.

- **Second Amendment entered into by the parties on June 15, 2020**, which extended the date after which the February 2020 Merger Agreement can be cancelled by either Camber or Viking, if not completed thereby, from June 30, 2020, to September 30, 2020, provided that either Camber or Viking have the right to further extend such date from time to time, until up to December 31, 2020, in the event that Camber has not fully resolved SEC comments on this joint proxy statement/prospectus, or other SEC filings related to the Merger, and Camber is responding to such comments in a reasonable fashion, subject to certain exceptions or Camber has resolved such SEC comments and has scheduled a meeting to approve the Merger, which meeting will occur after September 30, 2020.

- **Third Amendment entered into by the parties on June 25, 2020**, which (i) provided for the entry into the June 2020 Security and Purchase Agreement and the loan of the $4.2 million evidenced by the June 2020 Secured Note; (ii) provided for the requirement to pay the Additional Payment[9] as a break-up fee, in the event the Merger is terminated prior to closing; (iii) updated the percentages of Elysium, which are required to be returned to Viking upon termination of the Merger; (iv) confirm that none of the funds loaned by Camber to Viking would affect the agreed upon Merger ratios; and (v) allow for the Camber Board to authorize payment to its officers and directors, of consideration of $150,000 each ($600,000 in

---

[9]    Viking agreed that if the February 2020 Merger Agreement was terminated prior to closing of the Merger, Viking would owe Camber, in addition to the required repayment of the Secured Notes, a payment equal to (i) 115.5% of the original principal amount of the Secured Notes, minus (ii) the amount due to Camber pursuant to the terms of the Secured Notes upon repayment thereof (the "Additional Payment").

aggregate), for past services rendered and services to be rendered by such individuals through closing of the Merger, which compensation has been finalized.

65.    Ultimately, despite these three amendments to the February 2020 Merger Agreement, Camber and Viking again, without explanation, executed a new merger agreement – the Amended and Restated Agreement and Plan of Merger dated August 31, 2020, which included the three amendments and the following other provisions: (a) provided for Viking to continue to have 28,092 shares of Viking Series C shares issued and outstanding as of the closing of the Merger (**all owned by Doris**); (b) **provided for such Viking Series C shares to be exchanged, on a one-for-one basis for Series A Convertible Preferred Stock of Camber**; (c) made other amendments throughout the February 2020 Merger Agreement to provide for the concept of the exchange of Viking preferred stock for Camber preferred exchange; (d) removed the closing conditions related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which the parties determined did not apply to the Merger; (e) provided for Viking's consent to Camber's payment of the consideration to each non-executive member of the Camber Board and executive officers; (f) provided for Camber's consent to an amendment to the designation of the terms of the Viking Series C shares; (g) removed certain closing conditions to the Merger, which already occurred to date; (h) included as a closing condition that Viking must receive an opinion, from legal counsel or an independent public or certified accountant, in form and substance reasonably satisfactory to Viking, dated as of the closing date of the Merger, to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion, for U.S. federal income tax purposes, the Merger will be treated as a "reorganization" within the meaning of Section 368(a) of the Code; (i) provided that Viking shall not have more than 28,092 shares of Viking Series C shares issued and outstanding at the time the Merger closes; and (j) confirmed that if the Merger

is not completed because Camber's shareholders do not approve it, that Camber would retain 15% of Elysium.

66.     Once again, **after** execution of the Amended and Restated Agreement and Plan of Merger, on September 23, 2020, Viking engaged Scalar to provide an updated fairness opinion, which Scalar delivered to Viking on October 6, 2020. Similarly, on September 29, 2020, Camber engaged Mercer to provide an updated fairness opinion, which Mercer delivered to Camber on October 8, 2020.

67.     On October 9, 2020, Viking and Camber executed the First Amendment to Amended and Restated Agreement and Plan of Merger, which: (a) fixed the Camber ownership percentage of the combined company upon consummation at 20% (previously such percentage was adjustable between 15% to 25%, depending on certain factors at the time of closing); (b) extended the date that the merger agreement could be terminated by either party until December 31, 2020, provided that the right to terminate the Merger thereafter is not available to a party if the failure of the closing to occur by such date is principally due to the failure of such party to perform or observe the obligations, covenants, and agreements of such party set forth therein; and (c) removed the requirement that Viking obtain the consent of its lender, ABC Funding, LLC, for the Merger.

68.     On October 30, 2020, the SEC sent Camber questions regarding the amended S-4 Registration Statement that Camber filed on October 14, 2020, in connection with the Merger. The questions surrounded the scope of entitlements of Camber Series C Preferred Stock, and Camber's accounting treatment of them as permanent equity in its financial reports.[10] During this time, Camber

---

[10]     The sale of Camber Series C Preferred Stock was historically recorded by Camber on its balance sheet as "permanent equity" without a derivative liability component, and the queries from the SEC suggested that this accounting treatment should have been something other than permanent equity with a derivative liability component.

also failed to file a timely 10-Q with the SEC. Thus, with yet another delay to completing the Merger, between October 31, 2020, and December 18, 2020, Camber and its legal/accounting advisors worked on responding to the SEC's questions, and preparing Camber's quarterly financial statements for the period ending September 30, 2020. Camber eventually filed its 10-Q on December 18, 2020.

69.    Given the accounting issues that Camber needed time to resolve with the SEC, nearly a year after executing the February 2020 Merger Agreement, and nearly two years from when Camber and Viking began discussing a potential transaction, on December 23, 2020, the parties terminated the Amended and Restated Agreement and Plan of Merger (*i.e.*, the most recent iteration of the February 2020 Merger Agreement).

**B.    Doris Takes Over Camber, and Now Standing on Both Sides of the Merger, Forces Execution of the February 2021 Merger Agreement**

70.    **On the same day** that the parties terminated the Amended and Restated Agreement and Plan of Merger – the product of two years of negotiations – so that Camber could focus on resolving its accounting issues, Camber decided that it did however have time for a **seemingly out of the blue** transaction – **the acquisition of 51% of Viking's outstanding common stock**. For a money-strapped company like Camber, this was a significant investment that necessarily required planning, and discussions internally at Camber and with Viking (whom Camber had been negotiating a transaction with over the last two years).

71.    **As a result of Camber's acquisition of 51% of Viking, and again with no explanation, Schott and Schleizer resigned as Camber's CEO and CFO, respectively, with Doris appointed as Camber's new CEO and director, and Frank Barker Jr. ("Barker"), Viking's CFO, appointed as Camber's new CFO. Doris and Barker now stood on both sides of the Merger, and effectively controlled both Viking and Camber as they held the two most prominent executive positions in both companies.**

20

72.     Given that it was Camber that acquired a majority interest in Viking's common stock, it seems peculiar that Schott and Schleizer were the ones that resigned from their positions, and not Doris and Barker. Accordingly, this leads to the plausible inference that Doris knew that Schott and Schleizer wanted to leave Camber due to Camber's accounting issues with the SEC, so he seized the opportunity to provide them with an exit plan that benefited himself. Indeed, Doris orchestrated a back-door deal, negotiations of which are entirely omitted from the Proxy, that called for Camber to acquire a majority-stake in Viking so that Schott and Schleizer could resign, and Doris could take over. This allowed Doris, **now controlling both Camber and Viking, to force the companies to re-engage in Merger discussions, because Doris wanted to reap personal benefits from the Merger**.

73.     Along with Doris, Robert K. Green was also appointed to Camber's Board, and the two of them joined incumbent Camber directors Zeidman and Miller to make up Camber's 4-member Board.

74.     Wasting no time in his role as Camber's CEO and in line with his plan, on December 30, 2020, **<u>Doris sent a memo to the Camber Board, indicating that completion of the Merger was a priority</u>**. On January 4, 2021, the Camber Board specifically met to discuss the Merger.

75.     On January 8, 2021, at Doris' direction, Camber acquired another 10% equity stake in Viking, bringing **Camber's ownership interest in Viking to 61%**.

76.     Also, in January 2021, Doris caused Viking's legal counsel to prepare a draft merger agreement in connection with the Merger and circulate it to Camber's counsel.

77.     Given that Camber now owned 61% of Viking, that Doris was the CEO and director of both Viking and Camber, and that Doris was pushing to re-engage in discussions to complete

the Merger, this should have triggered the Viking Board to protect Viking's minority shareholders from being forced into an unfair Merger by a CEO that was on both sides of the transaction.[11] Instead, the Viking Board let Doris run the negotiations on both sides of the aisle, which meant that Doris negotiated with himself and for his own benefit. Thus, there was no one protecting the interests of the Viking minority shareholders.

78.    On or about February 4, 2021, Camber again engaged Mercer to provide a fairness opinion in connection with the Merger, with Barker designated as Camber's primary point of contact with Mercer. However, Barker was not an independent actor, as he was the CFO of Viking and Camber. On February 11, 2021, Mercer issued its fairness opinion that the new terms of the Merger were fair to Camber's shareholders.

79.    On February 15, 2021, Viking received a third fairness opinion from Scalar stating that the Merger was fair to Viking's shareholders.

80.    That same day, **Doris signed the February 2021 Merger Agreement on behalf of both Viking and Camber**, further solidifying his deep involvement in the Merger discussions on both sides. The following day, after Doris already signed the February 2021 Merger Agreement, the Viking and Camber Boards performatively ratified the Agreement and approved the Merger.

81.    Pursuant to the terms of the Agreement, each share of Viking common stock, issued and outstanding, other than shares owned by Camber, would be converted into the right to receive one share of Camber common stock, whereas each Viking Series C share – **exclusively held by**

---

[11]    Courts have found that strict protections should be put in place from the get-go in a controller buyout like this one, where Camber, the new owner of 61% of Viking's outstanding common stock, sought to acquire the remainder of Viking. *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (holding that the business judgment review applies to a merger proposed by a controlling stockholder conditioned "*ab initio*" on two procedural protections: (1) the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and (2) the uncoerced, informed vote of a majority of the minority stockholders.).

**Doris** – would be converted into the right to receive one Camber Series A share. As noted above, each Camber Series A share is convertible into 890 shares of Camber common stock (subject to a beneficial ownership limitation preventing conversion into Camber common stock if the holder would be deemed to beneficially own more than 9.99% of Camber's common stock) and will be treated equally with Camber's common stock with respect to dividends and liquidation.

        **C.**    **After Four Years, Doris Gets His Wish and Finally Consummates the Merger**

        82.    Just like what happened after execution of the Amended and Restated Agreement and Plan of Merger, Camber decided that it still needed significant time to resolve its accounting issues regarding the Camber Series C Preferred Stock, so it paused efforts to complete the Merger. Again, this raises the issue of why Camber was able to acquire a majority stake in Viking amidst its accounting issues, while needing to pause completion of the Merger for this reason on two separate occasions. Moreover, it is unclear why Doris pushed for Camber and Viking to restart Merger discussions the second he took over Camber, if Camber was still not ready.

        83.    On August 6, 2021, Viking acquired up to 60% of Simson-Maxwell, a distributor and major equipment manufacturer, for $7.958 million in cash.

        84.    On April 4, 2022, Viking announced that it was issued a new patent from ESG Clean Energy due to its solutions in clean energy and the development of a net-zero carbon footprint, with the license relating to its Bottom Cycle Power System and its carbon capture technology. As a revenue-generating scheme, Viking (under this patent) would be able to sell, lease, or sub-license its ESG Clean Energy System to third parties. Viking explained that it would use the Simson-Maxwell existing distribution channel to pursue sales. In line with this development, Viking was becoming stronger financially, announcing income of $1.33 million in

the year ending on December 31, 2021 (excluding the nearly $8 million it spent in acquiring a 60% interest in Simson-Maxwell), after a loss of $41.525 million in 2020.

85.    By June 2022, Camber was able to resolve its accounting issues by filing updated financial statements and becoming current with its SEC filings (Camber again filed a late 10-Q for the period ending March 31, 2021). As of that month, Camber had only $2.2 million of cash, its oil and gas properties were almost completely depreciated with revenues of just $0.3 million in H1 2022, and it had over $30 million in debt with its main asset being its stake in Viking.

86.    On June 13, 2022, John McVicar replaced Barker as Viking's CFO. However, *Viking's press release made clear that Barker, through his entity, FWB Consulting, LLC, would remain a consultant to Viking as needed*. Barker continued in his role as Camber's CFO. The Proxy entirely omitted the reason for Barker's resignation.

87.    During the second half of 2022, Camber engaged with significant holders of its convertible preferred stock regarding proposals to amend terms of Camber's outstanding convertible preferred stock, and entered into such amendments in November 2022 to reduce entitlements of the convertible preferred pertaining to issuances of Camber common stock pursuant to conversions of preferred stock, as well as modifying other terms of the majority of the then-outstanding Camber Series C Preferred Stock.

88.    With Camber's stock price falling steadily, it triggered entitlements associated with both previously converted, as well as outstanding shares of, Camber Series C Preferred Stock.[12]

89.    On December 27, 2022, Camber acquired all the assets of certain privately-held oil companies for $69 million, which again begs the question of how could a money-strapped company

---

[12]    Indeed, the more Camber's share price dropped, the more stock dilution there was from conversion of these Series C shares.

like Camber afford another significant acquisition like this one. This purchase included 169 proved producing oil wells, 174 proved non-producing wells, and 12 proved undeveloped well locations.

90.    In going back to his plan all along, **on March 3, 2023, Doris emailed the Camber Board to propose a discussion on re-engaging in Merger discussions with Viking. He sent a similar email to the Viking Board**, exemplifying that he was the driving force in pursuing and structuring the Merger.

91.    On March 8, 2023, Camber engaged Baker Botts L.L.P. ("Baker Botts") to provide legal counsel in connection with the Merger. Baker Botts and Doris discussed how to proceed with the Merger given that Doris was on both sides. Shockingly, during this drawn out and severely conflicted process, this was the first time such a discussion was had. Such a discussion was futile at this point given that Doris had already played an intricate role in negotiating the terms of the Merger and had set the field of play for the final Merger Agreement.

92.    On March 13, 2023, the Viking Board approved, via email, the resumption of Merger discussions with Camber. As expected, the following day, the Camber Board followed suit, and memorialized, via written consent, its decision to reengage in Merger discussions with Viking.

93.    On March 15, 2023, Camber once again engaged Mercer to provide a fairness opinion in connection with the revived February 2021 Merger Agreement. On March 21, 2023, Viking followed suit and engaged Scalar to provide a fairness opinion.

94.    Thereafter, Viking and Camber exchanged forecasts and financial information, and worked to update the terms of the February 2021 Merger Agreement. The companies also exchanged drafts of the Form S-4 Registration Statement that Camber would file with the SEC in connection with the Merger.

95.    On April 13, 2023, Baker Botts shared an initial draft of the amendment to the February 2021 Merger Agreement (the "Amendment") with Camber, the terms of which were not disclosed in the Proxy.

96.    Between March 14, 2023, and April 18, 2023, Doris maintained regular communication with the Camber Board, keeping them apprised of the terms of the Amendment and the progress of the Form S-4. Likewise, Doris did the same with the Viking Board.

97.    On April 14, 2023, Mercer presented its financial analysis of the Merger to the Camber Board, and this presentation was followed by an executed fairness opinion dated, April 18, 2023, rendering the Merger "fair".

98.    On April 18, 2023, the Viking Board and the Camber Board, respectively, approved and executed the Amendment to the February 2021 Merger Agreement (collectively, and as defined earlier, the "Merger Agreement").

99.    On April 19, 2023, **a day after the Merger Agreement was already executed**, Scalar presented its financial analysis of the Merger to the Viking Board, and delivered its formal opinion that the Merger was "fair" to Viking's shareholders. This again indicates that the fairness opinion was nothing more than a rubber stamp for a deal that had already been finalized by Doris.

100.    To further illustrate how conflicted this Merger really was, besides the obvious fact that Camber and Viking shared the same CEO and the same principal executives offices, Mercer and Scalar also shared the same office at 1120 6th Ave, New York, NY 10036.

## III.    The Proxy Omitted Material Information

101.    On June 13, 2023, Doris authorized the filing of the Proxy with the SEC, which recommended that Viking's shareholders vote in favor of the Merger. Doris was obligated to carefully review the Proxy prior to filing it with the SEC and disseminating it to Viking's

shareholders. However, the Proxy fraudulently misrepresented and/or omitted material information that was necessary for Viking's shareholders to cast an informed vote on the Merger at the Shareholder Vote, in breach of Doris's fiduciary duties.

102.    First, while the "Background of the Merger" section of the Proxy notes that "[o]n or about December 23, 2020, Camber completed a direct equity investment in Viking and acquired approximately 51% of Viking's outstanding common shares[,]" Proxy at 143, it fails to provide any information regarding the discussions that preceded Camber's decision to acquire such a sizeable portion of Viking. The direct equity investment transaction came out of the blue in the Proxy, as the Proxy's preceding description of events all pertain to a *potential merger* between Caber and Viking, not an equity investment. Obviously, there were discussions between Viking and Camber about the *reasons for and terms of Camber's equity investment*, but the Proxy fails to provide any information regarding those discussions. As a result, Viking's minority shareholders had no idea about the circumstances surrounding Camber's sudden pivot from a merger with Viking to a direct equity investment in Viking.

103.    Second, Proxy entirely omitted **why** Camber's CEO and CFO, Schott and Schleizer, resigned from their positions immediately after Camber acquired a majority stake in Viking. Additionally, the Proxy failed to disclose the discussions that took place between Camber and Viking's respective Board's and management that resulted in the decision for Doris and Barker to replace Schott and Schleizer as Camber's CEO and CFO. Clearly, there was an agreed upon plan in place between Viking and Camber that led to this decision.

104.    Third, while the Proxy touts Scalar's fairness opinion as one of the reasons for Viking shareholders to support the merger, it fails to disclose the financial forecasts that were key inputs in Scalar's analysis.

105.    Specifically, page 164 of the Proxy summarizes Scalar's Discounted Cash Flow Analysis as follows:

*Discounted Cash Flow Analysis*

Taking into account the estimation of unlevered beta contained in the selected companies analysis, Scalar applied a WACC of 8.9% to 10.9% to the **Viking Oil and Gas financial projections**, and a WACC of 17.3% to 22.3% to the **Simson Maxwell and Viking Corporate Overhead financial projections**. Scalar excluded the **Viking Ozone and Viking Open Conductor Detection financial projections** from the discounted cash flow analysis. Scalar included Viking's off balance sheet arrangement that guarantees that Camber's notes issued to Discover Growth Fund, LLC will be paid by Viking if Camber defaults on the notes and non-interest bearing amounts that Viking owes to Camber as a result of previous cash advancements as adjustments to the Discounted Cash Flow Analysis related to the Viking Corporate Overhead financial projections. The results of the discounted cash flow analysis have been incorporated below in the "Summary Analysis" with the results of the selected companies analysis and historical cost analysis.

106.    The summary of Scalar's Discounted Cash Flow Analysis thus refers to multiple different (undefined) cases of financial projections for Viking. However, only a single case of projections for Viking, referred to as the "Viking Energy Group Consolidated Financial Forecast", is disclosed in the Proxy at page 166. Moreover, the forecast on page 166 does not include cash flow projections, despite the fact Scalar performed a DCF analysis for Viking. Viking's minority shareholders were thus not provided with the various projections that Scalar used to value Viking, and had no idea how the projections used by Scalar related to the projections disclosed in the Proxy.

107.    Fourth, the Proxy failed to disclose the *actual results* of Scalar's selected companies analysis, discounted cash flow analysis, and historical cost analysis—the only three analyses Scalar performed. Rather, the Proxy bizarrely stated that "the results" of each analysis "have been incorporated below in the 'Summary Analysis' with the results" of each other analysis. Proxy at 164. And the "Summary Analysis" merely states:

*Summary Analysis*

After combining and analyzing the results of the selected companies analysis, discounted cash flow analysis, and historical cost analysis, Scalar noted that the intrinsic value of Viking's equity was less than zero dollars in each of the scenarios that Scalar analyzed. Scalar noted that the value of the consideration to be received by holders of Viking Common Stock in the Merger implied by the Exchange Ratio was greater than the closing price per share of Viking Common Stock on April 14, 2023, greater than the 20-Day volume weighted average price of Viking Common Stock on April 14, 2023, and **greater than the intrinsic value of the Viking Common Stock estimated by Scalar**. Scalar did not give any effect to potential future dilution of the Camber Common Stock from the conversion of the Camber Series C Preferred Stock to Camber Common Stock shares because Viking and Camber management communicated to Scalar that such conversion would not occur. Finally, Scalar **combined the intrinsic value of Viking's equity and the intrinsic value of Camber's equity** and still estimated that the pro forma value of Camber's equity after the Effective Time would be, although less than zero dollars in each of the scenarios that Scalar analyzed, greater than the equity value of Viking on a standalone basis. In Scalar's view, the results of all of the preceding analyses, observations and circumstances, taken as a whole, supported its assessment of the financial fairness of the Exchange Ratio.

108.    In other words, the "Summary Analysis" does not disclose the actual specific values that Scalar calculated under each analysis, nor the intrinsic value of Viking and Camber's equity that Scalar derived. Such information was material, as shareholders needed to understand each company's respective intrinsic value in order to assess the purported fairness of the Exchange Ratio. Furthermore, there is no explanation as to how Scalar determined that the intrinsic value of Viking equity was less than zero, given that Viking was projecting significant revenues and net income through 2027.

109.    Fifth, on June 13, 2022, McVicar replaced Barker as Viking's CFO, with a Viking press release indicating that Barker, through his entity, FWB Consulting, LLC, would remain a consultant to Viking as needed. Barker continued in his role as Camber's CFO. Yet, the Proxy did not disclose the reasons for Barker's resignation as Viking's CFO, especially in light of the fact that he continued to serve as Camber's CFO.

110.    Sixth, on April 13, 2023, Baker Botts shared an initial draft of the Amendment to the February 2021 Merger Agreement with Camber. However, the Proxy omitted what these renewed proposed terms were.

111.    Seventh, the Proxy falsely represented that all of Viking's directors, including Doris, believed "that the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger, are fair to, and in the best interests of, Viking and its stockholders[.]" Proxy at iii. As set forth herein, Doris knew that the Merger was not actually fair to Viking's minority stockholders, but rather, was facilitated by him in order to advance his own unique personal interests. Given his knowledge of both businesses, Doris, knew that Camber was an effectively worthless entity while Viking had promising stand-alone prospects, but nevertheless forced Viking minority stockholders into a merger with Camber to advance his own interests.

112.    As a result of these disclosures deficiencies, Viking minority stockholders that voted regarding the Merger were not fully informed of all material information.

## IV.    The Merger was Financially Unfair to Viking's Minority Stockholders

113.    The Merger offered little value to Viking's minority stockholders and failed to fairly compensate them for their shares, causing them damages.

114.    As elaborated above, Viking's business projects offered its shareholders significant and growing value prior to the Merger:

- The Company had assembled a diversified portfolio of operating subsidiaries in oil and gas production and power generation;

- Its largest subsidiary, Simson-Maxwell, was a leading Canadian-based manufacturer and supplier of industrial engines, power generation products, and services;

- It owned interests through further subsidiaries in multiple actively producing oil wells and development projects in Texas, Louisiana, Mississippi, and Kansas;

- It held an exclusive license in Canada to a patented carbon-capture system; and

- It owned majority interests in entities with intellectual property rights to (i) a medical waste treatment system; and (ii) electric transmission and distribution open conductor detection systems.

115.    The *pro forma* company's value and prospects were substantially derived from these lines of business. Indeed, as indicated by the combined financial statements included in the Proxy: (i) the bulk of the combined company's assets would consist of ***Viking's*** pre-close assets (Proxy at 29); (ii) nearly all of the combined company's revenue would result from ***Viking's*** operations (Proxy at 32, 33); and (iii) ***Camber's*** liabilities would cause the combined company to incur massive ongoing net losses (*id*.).

116.    Ironically – and further emphasizing Camber's uselessness as an independent business – the bulk of the value Camber contributed to the *pro forma* company's assets consisted of ***Camber's equity investment in Viking*** (Proxy at 29). Indeed, Camber generated a mere $597,255 in revenue in all of 2022 and a mere $93,471 in revenue in the first quarter of 2023 – as compared to the $24 million and $7.2 million in revenue Viking generated over the same respective periods.

117.    Despite the massive disparity in assets and operating performance between Viking and Camber, Viking's minority common shareholders prior to the transaction had their ownership and control of the *pro forma* entity significantly impaired by the Merger, with (i) pre-close Camber stockholders obtaining 20% of the combined company; (ii) and Doris receiving the right to obtain ownership of up to 9.99% of the combined company's common stock through the conversion of

his new Camber Series A shares. Viking's pre-close unaffiliated stockholders – already severely marginalized after Camber's acquisition of 61% of Viking's common stock – were further squeezed out of their economic interest in Viking's business.

118.    In contrast, the Merger offered significant value to Camber and its stockholders, not to mention Doris. Among other things, the Merger increased the liquidity of Camber's stock, granted Camber greater economies of scale, enhanced its ability to secure financing, and afforded Camber unique cost savings. Perhaps most importantly, the Merger allowed Camber to avoid having its stock delisted by the NYSE, thereby further postponing Camber's "judgment day" with the exchange.

119.    As noted, Camber regained compliance with the NYSE's listing standards in 2019.

120.    In 2022, however, Camber again fell afoul of the exchange's requirements after failing to timely file required reports, failing to timely hold annual meetings, and having its stock trade below the NYSE's required price threshold for more than 30 consecutive days. Although Camber was able to regain compliance for some time, Camber was once again notified by the NYSE in April 2023 that it was at risk of being delisted based on its violations of the exchange's listing standards.

121.    By design, the Merger allowed Camber to fortify its balance sheet, capture the value offered by Viking's assets and business projects, and thereby avoid or postpone Camber's "judgment day" with the NYSE. As disclosed in the Proxy:

> On May 9, 2023, Camber submitted to the NYSE American a plan of compliance addressing how Camber intends to regain compliance with Sections 1003(a)(i), (ii) and (iii) of the NYSE American Company Guide. Such plan included a four-pronged approach to regaining compliance and remedy the deficiency: (1) **consummate the Merger with Viking and consolidate the financial statements and balance sheets of Camber and Viking <u>to improve Camber's stockholders' equity position</u>**; (2) the continued reduction, and no further issuance, of Camber Series C Preferred Stock and the associated derivative liability, which has

decreased from 3,886 such shares outstanding as of January 1, 2022 to only 126 such shares as of June 5, 2023; (3) **commercialization post-Merger, as early as 2023, of certain of <u>Viking's</u>** existing technologies, including (A) <u>**Viking's**</u> license to a patented carbon-capture system, (B) <u>**Viking's**</u> majority interest in an entity with intellectual property rights to a fully developed, patented, proprietary medical and biohazard waste treatment system using ozone technology, and (C) <u>**Viking's**</u> ownership of entities with intellectual property rights to fully developed, patent pending, proprietary electric transmission and open conductor detection systems; and (4) pursuit of additional value-additive acquisition opportunities and reduction of long-term debt.

122.    Likewise, in an interview with LilaMax Media journalist Jane King,[13] Doris indicated that the transaction would largely benefit Camber, not Viking and its stockholders. As stated by Doris, the "three main items" supporting the deal were:

> "[F]irst, an immediate increase in revenues through <u>**Viking's**</u> active power solutions business, **[which] generates 60 times the revenue that Camber generates currently**; [...] secondly, we believe there is significant growth potential with respect to the innovative technologies that <u>**Viking**</u> has an interest in [...]; and then the final thing is just the additional acquisitions that the entire <u>**Viking**</u> team [...] can bring to the table when the organization is fully combined."

123.    Further, with respect to Viking's technologies, Doris stated that he was "optimistic that we will commercialize all the technologies this year."

124.    *I.e.*, the combined company's value would be built on **Viking's** contributions to the deal. Camber itself brought little or no business value to the table.

125.    In sum, the Merger (i) allowed Camber to avoid being delisted from the NYSE and capture Viking's business value for itself and other insiders, and (ii) allowed Doris to substantially increase his claims upon the combined company's common equity and economic value, all to the detriment of Viking's unaffiliated minority stockholders, who suffered damages by having their Viking stock exchanged for inadequate consideration.

---

[13]    Interview available at: https://youtu.be/xPeD229oSpI?t=54 (0:54-1:38)

## DORIS'S FIDUCIARY DUTIES AS CHIEF EXECUTIVE OFFICER, PRESIDENT, AND A DIRECTOR OF VIKING

126.     By reason of Doris's positions with Viking as an officer and director, he was in a fiduciary relationship with Plaintiff and the other public stockholders of Viking and owed them a duty of care, loyalty, good faith, candor, and independence.

127.     By virtue of his position as an officer and director of Viking, Doris, at all relevant times, had the power to control and influence Viking, did control and influence Viking, and caused Viking to engage in the practices complained of herein.

128.     To diligently comply with his fiduciary duties, Doris was prohibited from taking any action that: (i) adversely affected the value provided to Viking's stockholders; (ii) contractually prohibited him from complying with or carrying out his fiduciary duties to Viking stockholders; (iii) discouraged or inhibited alternative offers to purchase control of Viking or its assets; (iv) otherwise adversely affected his duty to search and secure the best value reasonably available under the circumstances for all Viking stockholders; and/or (v) provided himself or the other officers or directors of Viking with preferential treatment at the expense of, or separate from, the public stockholders.

129.     In accordance with his duties of good faith and loyalty, Doris was obligated to refrain from: (i) participating in any transaction where his loyalties were divided; (ii) participating in any transaction where Viking's officers' or directors' received, or were entitled to receive, a personal financial benefit not equally shared by the public stockholders of Viking; and/or (iii) unjustly enriching himself at the expense of or to the detriment of the public stockholders.

130.     In connection with his fiduciary duty of loyalty, care, and candor, Doris directly owed Plaintiff and all of Viking's shareholders a duty to disclose fully and fairly all material information within his control when he sought stockholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

131.    In connection with the Merger, Doris violated his fiduciary duties owed to Plaintiff and the other Viking public minority shareholders, and, as set forth above, Doris's breaches involved intentional misconduct, fraud, and/or were done with Doris's knowledge that he was violating his fiduciary obligations to Viking's minority stockholders.

### DORIS'S FIDUCIARY DUTIES AS A CONTROLLING STOCKHOLDER

132.    As the controlling stockholder of a publicly traded corporation, Doris was in a fiduciary relationship with Plaintiff and the other Viking minority shareholders. This required Doris to act in the best interests of Viking and its minority stockholders, owing them the highest obligations of good faith, fair dealing, loyalty, due care, and full and candid disclosure.

133.    In connection with the Merger, Doris violated his fiduciary duties owed to Plaintiff and the other Viking public minority shareholders, and, as set forth above, Doris's breaches involved intentional misconduct, fraud, and/or were done with Doris's knowledge that he was violating his fiduciary obligations to Viking's minority stockholders.

### CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public common stockholders of Viking (the "Class"). Excluded from the Class are Defendants herein and members of their immediate families, and any entity in which Defendants have a controlling interest.

135.    This action is properly maintainable as a class action because:

(a)    The Class is so numerous that joinder of all members is impracticable. As of May 22, 2023, the record date to vote on the Merger, there were 119,218,508 shares of Viking common stock outstanding, held by hundreds of individuals and entities throughout the country. Approximately 49,067,929 of those

shares were held by Class members. The actual number of Viking public stockholders will be ascertained through discovery;

(b) There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including whether Defendant Doris breached his fiduciary duties to Viking's minority stockholders, whether Camber aided and abetted breaches of duty by Doris, and whether Plaintiff and the Class suffered damages as a result of Defendants' wrongful conduct.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class; and

(d) Plaintiff's claims are typical of the claims of the Class, and Plaintiff does not have any interests adverse to the Class.

136.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

137.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

138.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**FIRST CAUSE OF ACTION**
**Against Doris for Breach of Fiduciary Duty in his capacity as Chief Executive Officer,**
**President, and a Director of Viking**

139.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

140.    By reason of Defendant Doris's position as CEO, President, and a director of Viking, he was in a fiduciary relationship with Plaintiff and the other public stockholders of Viking under Nevada law. He thus owed Viking's stockholders fiduciary duties of loyalty, good faith, and due care.

141.    As alleged herein, Defendant Doris willfully breached his fiduciary duties of loyalty, good faith, and due care by, as set forth above, pursuing and authorizing an unfair Merger between Camber and Viking that served his own interests and the interests of Camber to the detriment of minority stockholders in Viking.

142.    As a result of Defendant Doris's breaches, Plaintiff and other former public shareholders of Viking have suffered damages, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Against Doris for Breach of Fiduciary Duty in his Capacity as**
**Controlling Stockholder of Viking**

143.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

144.    By reason of Defendant Doris's position as controlling stockholder of Viking, Doris was in a fiduciary relationship with Viking's minority stockholders.

145.    In particular, and in the context of this specific Merger, Doris had the duty to ensure that the Merger was fair to Viking's minority stockholders.

146.    However, because Doris had interests that were inconsistent with the interests of Viking's non-controlling unaffiliated common stockholders, and because Doris willfully acted to unfairly favor his own interests at the expense of the Company's non-controlling unaffiliated common stockholders, Doris breached his fiduciary duties, including the duty to ensure that the Merger was fair to those stockholders.

147.    As a result of Defendant Doris's breaches, Plaintiff and other former public shareholders of Viking have suffered damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Against Camber for Aiding and Abetting**
**the Breaches of Fiduciary Duty by Defendant Doris**

148.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

149.    By committing the acts alleged herein, Defendant Camber aided and abetted Defendant Doris's breaches of fiduciary duty, and was an active and knowing participant in Defendant Doris's breaches of duty to Viking minority stockholders.

150.    In facilitating the Merger that was unfair to Viking stockholders, Camber acted through its President, Chief Executive Officer, and Director, Mr. Doris. Camber thus aided and abetted Doris's breaches of his fiduciary duties to Viking's minority stockholders.

151.    As a result of Defendant Camber's actions, Plaintiff and other former public shareholders of Viking have suffered harm and damages, in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

a.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

b.      Awarding Plaintiff and the Class all damages sustained as a result of Defendants'

wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-

appraisal damages, plus pre-judgment and post-judgment interest;

c.      Ordering Defendants to disgorge all ill-gotten gains obtained as a result of the

Merger;

d.      Awarding Plaintiff and the Class the costs and disbursements of this action,

including reasonable attorneys' and expert fees and expenses;

e.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

f.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED:  February 9, 2024                         Respectfully submitted,

**OF COUNSEL**                                   /s/ *Craig J. Geraci*
                                                 Craig J. Geraci
**MONTEVERDE & ASSOCIATES PC**                   Texas Bar No. 24095183
Juan E. Monteverde (application for              S.D. Tex. Bar No. 2743900
admission forthcoming)                           **KAHN SWICK & FOTI, LLC**
350 Fifth Avenue, Suite 4740                     1100 Poydras Street, Suite 960
New York, NY 10118                               New Orleans, LA 70163
Tel: (212) 971-1341                              Tel: (504) 455-1400
Fax: (212) 202-7880                              Fax: (504) 455-1498
jmonteverde@monteverdelaw.com                    craig.geraci@ksfcounsel.com

**KAHN SWICK & FOTI, LLC**                       *Attorneys for Plaintiff*
Michael J. Palestina (application for
admission forthcoming)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Tel: (504) 455-1400
Email: michael.palestina@ksfcounsel.com

*Attorneys for Plaintiff*